UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

QWEST COMMUNICATIONS                    No. 2:07-cv-00393-MCE-KJM
CORPORATION,

      Plaintiff,

    v.                                  MEMORANDUM AND ORDER

HERAKLES, LLC, et al,

      Defendants.


----oo0oo----


    Through the present action, Plaintiff Qwest Communications
Corporation ("Qwest") seeks damages from Defendants Herakles, LLC
("Herakles"), Sandy Beaches I LP ("Sandy Beaches"), Riptide I LP
("Riptide"), and Capital Lease Funding, Inc. and Capital Lease
Funding, LP, for deceptive advertising, breach of contract,
constructive fraud and breach of fiduciary duty, statutory and
common law unfair competition, tortious interference with both
prospective economic advantage and with contract, unjust
enrichment, civil conspiracy, and aiding and abetting.
///

1

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Herakles, Sandy Beaches, and Riptide (collectively "Defendants") filed the present Motions to Dismiss all counts pled against them.[1]  As set forth below, those Motions will be granted in part and denied in part.

## BACKGROUND[2]

This action arises from the circumstances surrounding the performance of three contracts, which governed the construction, occupation, and management of a Data Center in Sacramento, California.  Originally, Qwest and Wavve Telecommunications, Inc. ("Wavve") contemplated entering only one agreement to achieve these objectives.  However, when the now defunct Wavve was unable to obtain financing from the CapLease Defendants, the parties restructured their arrangement via the three current contracts.  First, Qwest leased the Data Center from Sandy Beaches ("Lease").  Next, Qwest subleased a portion of the Data Center to Riptide ("Sublease").  Finally, Qwest entered a Real Estate Services Agreement ("RESA") with Wavve for the management of Qwest's portion of the Data Center.

///

---

[1] The two other named Defendants, Capital Lease Funding, Inc. and Capital Lease Funding LP ("CapLease Funding Defendants"), have collectively filed another Motion to Dismiss in this matter.  Because both the allegations levied against the CapLease Funding Defendants, as well as the resolution of their motion, vary from the other Defendants considered herein, the CapLease Funding Motion will be addressed by separate Order.

[2] This section is derived from the allegations in Plaintiff's Complaint.

Riptide subsequently assigned its rights in the Sublease to Herakles.  Wavve assigned its rights in the RESA to Surferr LLC, an entity alleged to be related to Herakles, Sandy Beaches, and Riptide.  Surferr LLC then assigned its rights in the RESA to Riptide, who subsequently re-assigned those rights to Herakles. Qwest alleges that Herakles is now both its competitor and sublessor tenant, as well as the manager of Qwest's portion of the Data Center.

The Lease terms extend for a period of ten years, with the option to renew for another nine.  Qwest uses the leased space to provide co-location, data center, telecommunications, internet access, content hosting, network management, and internet security services.  The Lease provides for a "Tier IV data center" with 99.999% operational availability and contains a confidentiality clause, which, according to Qwest, Sandy Beaches has violated.

Qwest alleges that the RESA requires Herakles to act as Qwest's "exclusive agent" in managing the Data Center and Qwest further alleges that the parties agreed that the Data Center manager would be the "face of Qwest" to Qwest's customers and potential customers.  However, Qwest now claims that, instead, Herakles, as the current manager, diverted customers from Qwest to itself, in its separate capacity as Qwest's sublessor.

Qwest also claims that Herakles engaged in deceptive advertising by making statements purporting to be the Data Center owner on the Herakles website and within the Data Center.

///

///

Additionally, Qwest alleges that Herakles misrepresented the property in Data Center sign-in sheets by omitting Qwest's name on the logs and that Herakles took Qwest's proprietary customer and potential customer information.

Qwest further states that Herakles has failed to perform certain construction work as obligated under the RESA and that, in its capacity as sublessor, Herakles has failed to hire a required third-party manager for its own portion of the Data Canter.  Instead, despite being a competitor of Qwest, Herakles allegedly manages both the Qwest facility and its own facility, to save itself added management costs.

Finally, Qwest alleges that Herakles, Riptide, Sandy Beaches and the CapLease Defendants are alter egos of one another.  Qwest alleges that the Defendants have common ownership, use one company as a conduit for another, and share offices, employees, and bank accounts.  Qwest alleges that this practice enables Herakles to breach its contract without liability, all the while collecting Qwest's rent payments through Sandy Beaches and diverting customers to itself.


**STANDARD**

**A.   Motion to Dismiss Under Rule 12(b)(6)**

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).

4

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the...claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, --- U.S. ---, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Id. at 1964-65 (internal citations and quotations omitted).  Factual allegations must be enough to raise a right to relief above the speculative level.  Id. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ("The pleading must contain something more...than...a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")).

A court granting a motion to dismiss a complaint must then decide whether to grant leave to amend.  A court should "freely give" leave to amend when there is no "undue delay, bad faith[,] dilatory motive on the part of the movant,...undue prejudice to the opposing party by virtue of...the amendment, [or] futility of the amendment...."  Fed. R. Civ. P. 15(a); Foman v. Davis, 371 U.S. 178, 182 (1962).  Generally, leave to amend is denied only when it is clear the deficiencies of the complaint cannot be cured by amendment.  DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992).

///

1        **B.    General Pleading Requirements**

2

3        "Rule 8(a)(2)...requires a 'showing,' rather than a blanket

4   assertion of entitlement to relief.  Without some factual

5   allegation in the complaint, it is hard to see how a claimant

6   could satisfy the requirements of providing not only 'fair

7   notice' of the nature of the claim, but also 'grounds' on which

8   the claim rests."  Id. at 1965 n.3. (Factual allegations

9   necessary to plead "grounds" on which claim rests.)

10       A pleading must contain "only enough facts to state a claim

11  to relief that is plausible on its face."  Id. at 1974.  If the

12  "plaintiffs...have not nudged their claims across the line from

13  conceivable to plausible, their complaint must be dismissed."

14  Id.   Nevertheless, "[a] well-pleaded complaint may proceed even

15  if it strikes a savvy judge that actual proof of those facts is

16  improbable, and 'that a recovery is very remote and unlikely.'"

17  Id. at 1965.

18       Federal Rule of Civil Procedure 9(b) provides that "a party

19  must state with particularity the circumstances constituting

20  fraud."  "A pleading is sufficient under Rule 9(b) if it

21  identifies the circumstances constituting fraud so that the

22  defendant can prepare an adequate answer from the allegations."

23  Neubronner v. Milken, 6 F.3d 666, 671-672 (9th Cir. 1993)

24  (internal quotations and citations omitted).  "The complaint must

25  specify such facts as the times, dates, places, benefits

26  received, and other details of the alleged fraudulent activity."

27  Id. at 672.

28  ///

**ANALYSIS**

**A.    Defendants' Alter Ego Liability**


    "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003).  Alter ego liability, however, provides a means to pierce the corporate veil for purposes of imposing liability on a defendant for an underlying cause of action.  See Dion LLC, v. Infotek Wireless, Inc., 2007 WL 3231738 at *3 (N.D. Cal. Oct. 30, 2007) (quoting Local 159 v. Nor-Cal Plumbing, Inc., 185 F.3d 978, 985 (9th Cir. 1999)).

    Assessing a corporate entity's alter ego status is an equitable determination within the province of the trial court. Assoc. Vendors, Inc., v. Oakland Meat Co., Inc., 210 Cal. App. 2d 825, 837 (1st Dist. 1962).  Decisions are necessarily fact-dependent and "vary according to the circumstances in each case." Id. (internal quotations omitted).  Nevertheless, the general requirements for proving liability are "1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and 2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." Id.  "Bad faith in one form or another is an underlying consideration and will be found in...those cases wherein the trial court was justified in disregarding the corporate entity." Id. at 838.

///

///

7

1    Among the factors supporting a "unity of interest" finding

2    are "financial issues (e.g., was the corporation adequately

3    capitalized?); corporate formality questions (e.g., was stock

4    issued, are minutes kept and officers and directors elected, are

5    corporate records segregated?); ownership issues (e.g., what is

6    the stock ownership picture?); commingling issues (e.g., are

7    corporate assets commingled, does the parent company merely use

8    the corporate shell of the subsidiary to obtain goods and

9    services for the parent company?); etc." <u>Tomaselli v.</u>

10   <u>Transamerica Ins. Co.</u>, 25 Cal. App. 4th 1269, 128 n.13. (citing

11   <u>Assoc. Vendors, Inc.</u> at 837-842).  Notably, "[t]he mere fact of

12   sole ownership and control does not eviscerate the separate

13   corporate identity that is the foundation of corporate law."

14   <u>Katzir's Floor and Home Design, Inc. v. M-MLS.com</u>, 394 F.3d 1143,

15   1149 (9th Cir. 2004)(citing <u>Dole Food Co.</u> at 475).

16   Under the second prong of the doctrine, "[a]lter ego

17   is...invoked only where recognition of the corporate form would

18   work an injustice to a third person." <u>Id</u>. (quoting <u>Tomaselli</u> at

19   1285).  "The injustice that allows a corporate veil to be pierced

20   is not a general notion of injustice; rather, it is the injustice

21   that results only when corporate separateness is illusory."

22   <u>Katzir's Floor and Home Design</u> at 1149.  Facts relevant to the

23   "injustice" inquiry include "inadequate capitalization,

24   commingling of assets, [a] disregard of corporate

25   formalities...[and] any other facts which demonstrate the

26   critical element: that an inequitable result would have

27   followed." <u>Tomaselli</u> at 1285.

28   ///

1   Conclusory allegations are not sufficient to support an

2   alter ego finding. Hokama v. E.F. Hutton & Co., Inc., 566 F.

3   Supp. 636, 647 (C.D. Cal. 1983); Maganallez v. Hilltop Lending

4   Corp., 505 F. Supp. 2d 594, 607 (N.D. Cal. 2007). In Brennan v.

5   Concord EFS, Inc., the Northern District determined that a

6   statement alleging only that "Bank One exercised such dominion

7   and control over Bank One, NA and Bank One Arizona that it [was]

8   liable according to the law for the acts of Bank One" was an

9   inadequate legal conclusion. 369 F. Supp. 2d 1127, 1136 (N.D.

10  Cal. 2005).

11  Similarly, in Nordberg v. Trilegiant Corp., the Northern

12  District granted a motion to dismiss, stating that allegations of

13  "routine control by a parent [were] insufficient to support the

14  contention that a subsidiary is a mere instrumentality." 445 F.

15  Supp. 2d 1082, 1102 (N.D. Cal. 2006). Additionally, in Long v.

16  Postorivo, the plaintiffs' allegations "that Postorivo was the

17  founder and former CEO and president of National...that Postorivo

18  worked 'in close coordination' with National,...that Postorivo

19  personally assured [plaintiff] of the success of their business

20  transactions," and that defendant sold off corporate assets to

21  prevent recovery were "only slightly beyond conclusory" and

22  insufficient to withstand defendants' motion for judgment on the

23  pleadings. 2007 WL 2990457 at *1-2 (N.D. Cal. 2007).

24  Other plaintiffs, however, have met the minimum factual

25  pleading threshold. In Maganallez v. Hilltop Lending Corp., the

26  Northern District found the following allegations sufficient to

27  allege alter ego liability:

28  ///

1   "[Hilltop Lending] was inadequately capitalized, failed
2   to maintain corporate formalities and was designed to
    limit the liability of Nguyen.  There was such a unity
3   of interest and ownership between Nguyen and [Hilltop
    Lending] that the individuality and separateness of
4   Nguyen and [Hilltop Lending] has ceased to exist and
    adherence to the fiction of the separate existence of
5   [Hilltop Lending] would sanction fraud and promote
    injustice."

6   505 F. Supp. 2d 594, 607 (N.D. Cal. 2007).

7       Likewise, in In re Napster, Inc. Copyright Litigation, the

8   allegation that the defendant exercised "essentially full

9   operational control" over Napster was sufficient to withstand a

10  motion to dismiss.  354 F. Supp. 2d 1113, 1122 (N.D. Cal. 2005).

11  Furthermore, in Dion LLC v. Infotek Wireless, Inc., the plaintiff

12  successfully alleged that

13      "[t]he unity of interest and ownership between [the
        defendants]...prevented the two from functioning as
14      separate entities...[The two companies] conduct[ed] the
        same type of business, shared the same office space,
15      used the same business address, and had the same
        bookkeeper, lawyers and CPA...[I]t would be inequitable
16      to allow [the defendant] to now assert a distinction
        between the corporations to avoid liability."
17

18  2007 WL 3231738 at *3 (N.D. Cal. 2007).

19      In this case, Qwest specifically alleges the following:

20      Herakles is located at 1100 North Market Boulevard
    in Sacramento, California.  Compl., ¶ 6.  The Data
21  Center is also housed at 1100 North Market Boulevard.
    Compl., ¶ 12.
22
        Sandy Beaches, Riptide, and the now defunct Wavve
23  all operated out of 9322 Tech Center Drive, in
    Sacramento, California.  Compl., ¶¶ 7-8, 10.
24
        The Defendants share common officers and
25  directors.  For example, Lou Kirchner is both the
    President and CEO of Herakles, as well as the CEO of
26  Sandy Beaches, and he sits on the Board of Directors of
    Sandy Beaches.  As a further example, William Pollert
27  and Shawn Seale of the CapLease Defendants are also
    officers of Riptide.
28

1    Finally, the Lease, RESA, and Sublease were all signed
     by Diana Bushard as "Vice President of Legal." Compl.,
2    ¶ 53.

3        On information and belief, the Defendants have
     substantially similar equitable ownership. Compl.,
4    ¶ 53.

5        On information and belief, the Defendants use the
     same offices and employees. For example, on
6    information and belief, some of the senior managers of
     the CapLease Defendants are part owners of the Data
7    Center. Sandy Beaches, Wavve, and Riptide have the
     same address. Compl., ¶ 53.
8
         On information and belief, the Defendants use one
9    entity as a mere conduit for the affairs of the other,
     e.g., the parent company merely uses the subsidiary to
10   take Qwest's Lease payments (which, upon information
     and belief, the parent company uses to remain
11   financially afloat) in one hand, and with the other
     hand, misappropriates Qwest of the business that is the
12   essential purpose of the Lease. Compl., ¶ 53.

13       On information and belief, the Defendants
     commingle corporate assets. For example, Qwest pays
14   rent to a common account for Sandy Beaches and
     Herakles. Indeed, Herakles' [sic] has presented itself
15   on its website as the owner of Sandy Beaches' main
     asset, the Data Center. Compl., ¶ 53.
16
         The circumstances surrounding the execution of the
17   Lease, RESA and Sublease, including the cost structure
     and language of the three agreements establish that the
18   agreements should be construed together and that Sandy
     Beaches should be construed as the real party-in-
19   interest or that the Defendants should be treated as
     one entity or the alter egos of each other. Compl.,
20   ¶ 53.

21       Honoring the Defendants' corporate shells would
     promote a fraud or injustice against Qwest because the
22   same officers, directors, and employees have caused
     Herakles to breach its agreements and fiduciary duties
23   to Qwest, depriving Qwest of its ability to obtain and
     serve customers...while simultaneously collecting rent
24   from Qwest under the Lease. Compl., ¶ 54.

25   The above allegations are far from conclusory, and allege a

26   unity of interest that renders the Defendants' separate entities

27   illusory.

28   ///

Qwest's allegations that it would be unjust to allow Defendants to hide behind this illusory shield are sufficient as well. Accordingly, the Court finds that Qwest's allegations that Herakles, Sandy Beaches, and Riptide are the alter egos of one another meet the requirements of Rule 8(a).

**B.   Qwest's Claims Against Defendants**

         **1.   Count I – False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125, Sections 43(a) and 43(b) (Against Herakles/All Defendants)**

"The elements of the Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

Notably, Herakles does not challenge this Count in its Motion to Dismiss. Additionally, Sandy Beaches raises a challenge only on its own behalf stating, "All of these allegations implicate Herakles' conduct, but make absolutely no mention of [Sandy] Beaches."

1   Sandy Beaches' Motion to Dismiss, 15:12-13.  Similarly, Riptide

2   states, "Qwest's Lanham Act allegations implicate only Herakles,

3   not Riptide."  Riptide's Motion to Dismiss, 4:23-24.  Neither

4   Sandy Beaches nor Riptide raised any challenges to the

5   sufficiency of the allegations against Herakles.  Therefore,

6   Defendants' collective lack of opposition to Qwest's claim

7   against Herakles, coupled with Plaintiff's alter ego allegations,

8   which could extend liability to all Defendants, are sufficient to

9   withstand Defendants' Motions to Dismiss.

10      Even if that were not the case, Plaintiff's allegations are

11  independently sufficient to withstand a Motion to Dismiss.

12  Plaintiff alleges that Herakles made numerous inaccurate or false

13  statements regarding Data Center ownership and services on

14  Herakles' website.  Plaintiff further alleges facts sufficient to

15  show that the statements were both material and damaging.  These

16  allegations provide sufficient notice to allow Defendants to

17  answer the Complaint.  Hence, Defendants' Motions to Dismiss

18  Count I are DENIED.

19

20          **2.   Counts II - IV - Breach of Contract - Lease**
21          **(Against Sandy Beaches/All Defendants); RESA -**
            **(Against Herakles/All Defendants); Sublease**
            **(Against Herakles/All Defendants)**
22

23      To prove a breach of contract claim, Plaintiff must show:

24  1) a contract; 2) Plaintiff's performance or excuse for

25  nonperformance; 3) Defendant's breach; and 4) resulting damage to

26  the Plaintiff.  Wise v. Southern Pac. Co., 223 Cal. App. 2d 50, 59

27  (1st Dist. 1963), overruled on other grounds by Applied Equipment

28  Corp. v. Litton Saudi Arabia Limited, 7 Cal. 4th 503 (1994).

1    Defendants are correct that "[u]nder California law, only a

2    signatory to a contract may be liable for any breach." <u>Clemens</u>

3    <u>v. American Warranty Corp.</u>, 193 Cal. App. 3d 444, 452 (2d Dist.

4    1987).  In reliance on that proposition, Defendants spend much of

5    their arguments pointing out that the allegations of breach of

6    the various agreements were not made against them individually,

7    but were made based on the actions of their Co-Defendants.  At no

8    point do any of the Defendants argue that the allegations against

9    the actual parties to each contract are insufficient.

10    As an example, Sandy Beaches states, "[w]hile the Complaint

11    is replete with allegations regarding Herakles' conduct in

12    connection with various other claims and Agreements, Qwest does

13    not identify any conduct by [Sandy] Beaches that could support a

14    breach of contract claim against [Sandy] Beaches."  Sandy

15    Beaches' Motion to Dismiss, 6:10-12.  Sandy Beaches' argument

16    serves to emphasize the thoroughness of the allegations against

17    Herakles, its alleged alter ego.

18    Therefore, Defendants' Motions fail.  Plaintiff has pled all

19    elements of breach of contract as to each agreement.  Since

20    Plaintiff has also pled sufficient facts to support the alter ego

21    liability of all Defendants, Defendants' Motions to Dismiss

22    Counts II through IV are DENIED.[3]

23

24    [3] The parties dispute whether Qwest's filing of this suit is
   premature in light of contract provisions in the Lease purporting
25    to give Sandy Beaches an opportunity to cure.  Construing all
   pleadings in the light most favorable to Qwest, for purposes of
26    the current Motions the disputed Contract provision will be
   interpreted as Qwest suggests, to indicate just one of the
27    remedies available to it.

28                                    (continued...)

14

1

         **3.    Count V - Common Law and Cal. Civ. Code § 1573 -
2               Constructive Fraud - Breach of Fiduciary Duty
                (Against Herakles/All Defendants)**

3

4        "In its generic sense, constructive fraud comprises all

5   acts, omissions and concealments involving a breach of legal or

6   equitable duty, trust, or confidence, and resulting in damages to

7   another.  Constructive fraud exists in cases in which conduct,

8   although not actually fraudulent, ought to be so treated-that is,

9   in which such conduct is a constructive or quasi fraud, having

10  all the actual consequences and all the legal effects of actual

11  fraud."  <u>Barrett v. Bank of America</u>, 183 Cal. App. 3d 1362, 1368-

12  1369 (4th Dist. 1986) (internal citations and quotations

13  omitted).

14       The elements of constructive fraud are: 1) a fiduciary or

15  confidential relationship; 2) an act, omission, or concealment

16  involving a breach of that duty; 3) reliance; and 4) resulting

17  damage.  <u>Neilson v. Union Bank of California</u>, 290 F. Supp. 2d

18  1101, 1142 (C.D. Cal. 2003).  Breach of fiduciary duty

19  constitutes a constructive fraud.  <u>California Real Estate Loans,</u>

20  <u>Inc. v. Wallace</u>, 18 Cal. App. 4th 1575, 1581 (1st Dist. 1993).

21  ///

22  ///

23  ///

24

25       [3](...continued)
    Case law cited by Defendants is inapposite because it involves a
26  standstill provision related to a settlement agreement and the
    parties in that case disputed only the calculation of the
27  applicable period, not the application of the actual provision.
    <u>See</u> <u>Willis Corroon Corp. of Utah, Inc. v. United Capital Ins.</u>
28  <u>Co.</u>, 1998 WL 30069 (N.D. Cal. 1998).

                                 15

1    An agency relationship creates a fiduciary duty.  <u>Maganallez</u>
2    <u>v. Hilltop Lending Corp.</u>, 505 F. Supp. 2d 594, 608 (N.D. Cal.
3    2007).  The parties primary current disagreement is whether
4    Herakles is an agent of Qwest for purposes of the RESA.  To
5    properly allege this fiduciary relationship and the remaining
6    elements of the Count, Qwest must meet Rule 9(b)'s particularity
7    requirements for pleading fraud.

8        To meet its pleading threshold, Qwest specifically alleges
9    that Herakles was contractually obligated to act as its
10   "exclusive agent."[4]  Herakles subsequently points to language in
11   the same paragraph to support its argument that Herakles is an
12   "independent contractor."  This apparently contradictory language
13   is not dispositive, however, because an independent contractor
14   can also be an "agent."  In re Coupon Clearing Service, Inc.,
15   113 F.3d 1091, 1100 (9th Cir. 1997); Channel Lumber Co., Inc. v.
16   Porter Simon, 78 Cal. App. 4th 1222, 1230 (3d Dist. 2000); City
17   of Los Angeles v. Meyers Bros. Parking System, Inc., 54 Cal. App.
18   3d 135, 138 (2d Dist. 1975).
19   ///
20   ///

21
22   [4] Herakles argues that Qwest cannot claim that a fiduciary
     relationship arises out of the parties' contractual obligations.
     This argument is misguided.  Herakles relies on <u>Rickel v. Schwinn</u>
23   <u>Bicycle Co.</u>, which states, "Plaintiffs have failed to allege
     facts which imply that anything more than a contractual
24   relationship existed here; a fiduciary relationship does not
     exist."  144 Cal. App. 3d 648, 655 (2d Dist. 1983).  However,
25   this ignores the preceding language, "California law is that
     parties to a contract, by that fact alone, have no fiduciary
26   duties toward one another."  <u>Id</u>. at 654.  This language would not
     apply if the parties contracted to enter a fiduciary
27   relationship, as is alleged here.  It would be an absurd result
     indeed if the contract itself negated the fiduciary duties
28   arising from an alleged agency agreement.

"One who contracts to act on another's behalf and is subject to the other's control...may still be acting as an agent and also as an independent contractor."  In re Coupon Clearing Service, Inc., 113 F.3d 1091, 1100 (9th Cir. 1997).  "One of the chief characteristics of an agency relationship is the authority to act for and in the place of the principal for the purposes of bringing him or her into legal relations with third parties." DSU Aviation, LLC v. PCMT Aviation, LLC, 2007 WL 3456564, *5 (N.D. Cal. 2007).  "The other important aspect in determining the existence of an agency relationship is the degree of control exercised by the principal over the activities of the agent." Id.  "If the principal has the right to control the agent's day-to-day operations, then an agency relationship exists.  If, however, the principal has no control over the day-to-day operations and only has [the] right to dictate the end result of the agent's activities, then an 'independent contractor' relationship exists."  Figi Graphics, Inc. v. Dollar General Corp., 33 F. Supp. 2d 1263, 1266 (S.D. Cal. 1998) (citing Coupon Clearing Services at 1099-1100).

In DSU Aviation, the plaintiffs' allegations that the defendants were responsible for securing insurance and had the authority to enter into contracts with third-parties were sufficient to evidence that those plaintiffs had relinquished to the defendants the "authority to transact...or manage some affair."  DSU Aviation at *5 (citing Coupon Clearing Services at 1099).

///

///

17

1   The Southern District, in Figi Graphics, in analyzing a
2   motion to dismiss for lack of personal jurisdiction, determined
3   that allegations were insufficient to show the requisite "right
4   to control." Figi Graphics at 1266. In that case there was no
5   evidence that the alleged principal decided where the alleged
6   agent would find its products, what products it would buy, from
7   whom it would purchase or the price it would pay. Id. at 1266-
8   1267.
9   Plaintiff's agency allegations similarly fall short of the
10  mark. Plaintiff alleges that under its contemplated agreement
11  with Wavve, "Wavve was to be the face of Qwest to Qwest's
12  customers and prospective customers." Compl., ¶ 12. However,
13  Plaintiff does not allege that this agreement ever came to
14  fruition. Rather, Plaintiff alleges that the three agreements
15  replacing the originally contemplated agreement "were intended to
16  and did provide Qwest with the same operational rights and
17  commitments that the contemplated agreement between Qwest and
18  Wavve envisioned; namely...a third-party manager who was the face
19  of Qwest at the Data Center." Id. ¶ 14. Plaintiff otherwise
20  relies on the contract term "exclusive agent" and further alleges
21  that under the original contemplated agreement with Waave, "the
22  parties agreed that the manager under the RESA would conduct
23  themselves at all times as Qwest's fiduciary and exclusive
24  agent." Compl., ¶ 27. Qwest's allegations do not show that
25  Qwest controlled Herakles in any manner or that Herakles had the
26  "authority to transact...or manage some affair" on Qwest's
27  behalf.
28  ///

18

1    Plaintiff's allegations that Herakles acted as its agent are

2   wholly conclusory.  Even without applying Rule 9(b)'s heightened

3   pleading standard, Qwest has not sufficiently alleged the

4   required elements to establish the existence of an agency

5   relationship and, therefore, is unable to establish the breach of

6   such a relationship.  Hence, Defendants' Motions to Dismiss

7   Count V are GRANTED, with leave to amend.

8

9               **4.   Count VI - Violation of the Unfair Competition
                      Act, Cal. Bus. & Prof. Code §§ 17200, 17500 et**
10                    **seq. (Against Herakles/All Defendants)**

11

12    Herakles does not challenge the allegations in this Count.

13   Both Sandy Beaches and Riptide argue that this claim is directed

14   only at Herakles and does not implicate them individually.

15   Therefore, considering the lack of opposition to the allegations

16   against Herakles in conjunction with the above alter ego

17   allegations, Defendants' Motions to Dismiss must fail.  Hence,

18   the Motions to Dismiss Count VI are DENIED.

19

20               **5.   Count VII - Common Law Unfair Competition (Against
                      All Defendants)**

21

22    "Claim[s] of unfair competition can encompass a variety of

23   theories."  Self Directed Placement Corp. v. Control Data Corp.,

24   908 F.2d 462, 467 (9th Cir. 1990).  There is some confusion among

25   the parties as to the theory of competition on which Qwest

26   relies.

27   ///

28   ///

                                    19

1   Nevertheless, regardless of theory, in order for competition to

2   rise to the level of "unfair," it must involve "wrongful conduct

3   such as fraud, misrepresentation, intimidation, coercion, [or]

4   obstruction." Scudder Food Products v. Ginsberg, 21 Cal. 2d 596,

5   599 (1943) (quoting Katz v. Kapper, 7 Cal. App. 2d 1, 4 (2d Dist.

6   1935)).

7       Defendants argue that Qwest only alleged one theory of

8   unfair competition, misappropriation.  Under this theory

9   Plaintiff must prove that it "invested substantial time and money

10  in development of its...property,...that [D]efendant[s]

11  appropriated the property at little or no cost, and...that

12  [Qwest] has been injured by the [D]efendant[s]' conduct." Self

13  Directed at 467 (quoting Balboa Ins. Co. v. Trans Global

14  Equities, 218 Cal. App. 3d 1327, 1342 (3d Dist. 1990) (internal

15  quotations omitted)).

16      Qwest alleges that Herakles misappropriated the names and

17  identities of customers and potential customers whose

18  relationships Qwest cultivated.  Defendants counter that Qwest

19  could not have spent the requisite labor, skill, and money to

20  compile customer information since the visitors to the Data

21  Center provided their own information to Herakles via the visitor

22  sign-in sheets.

23      Defendants' argument is flawed for two reasons.  First,

24  since Qwest alleges that Herakles was acting as Qwest's

25  "exclusive agent" when Herakles acquired the relevant

26  information, it can be inferred that Qwest invested funds in

27  management fees to Herakles to acquire that data.

28  ///

Second, it can also be inferred that Qwest invested time and funds in cultivating customer and potential customer relationships in the first place.

Because this Court finds that Plaintiff adequately alleged a claim for unfair competition based on misappropriation, there is no need for this Court to address all additional potential unfair competition claims that Plaintiff might have intended. Defendants' Motion to Dismiss Count VII is DENIED.

> **6.     Count VIII - Tortious Interference with Prospective Economic Advantage (Against Herakles/All Defendants); Count IX - Tortious Interference with Contract (Against Herakles/All Defendants); Count X - Tortious Interference with Contract (Against Herakles)**

"In order for [Qwest] to prove tortious interference with prospective economic advantage[("TIPEA")], it must show 1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; 2) [D]efendant[s'] knowledge of the relationship; 3) intentional, wrongful acts on the part of [D]efendant[s] designed to disrupt the relationship; 4) actual interference with or disruption of the relationship; and 5) economic harm to the [P]laintiff proximately caused by the acts of the [D]efendant[s]." <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1153-1154 (2003).

///

///

///

///

1  "This tort...'protects the expectation that the relationship
2  eventually will yield the desired benefit, not necessarily the
3  more speculative expectation that a potentially beneficial
4  relationship will arise.'" Id. at 1164 (quoting Westside Center
5  Associates v. Safeway Stores 23, Inc., 42 Cal. App. 4th, 507, 524
6  (5th Dist. 1996).  Additionally, the requisite wrongfulness must
7  derive from something other than the fact of interference itself.
8  Id. at 1153.  "[A]n act is independently wrongful if it is
9  unlawful, that is, if it is proscribed by some constitutional,
10 statutory, regulatory, common law, or other determinable
11 standard."  Id. at 1159.  Finally, Plaintiff need not prove that
12 Defendants specifically intended to interfere with its business
13 expectancy, but must show that Defendants "knew that the
14 interference was certain or substantially certain to occur as a
15 result of [their] action[s]."  Id. at 1154.

16 Alternatively, in order for Plaintiff to properly allege
17 tortious interference with contract ("TIC"), Plaintiff must show
18 1) the existence of a valid contract with a third party;
19 (2) Defendants' knowledge of that contract; (3) Defendants'
20 intentional acts designed to induce a breach or to disrupt the
21 contractual relationship, (4) actual breach or disruption of the
22 contractual relationship, and (5) resulting damage.  Bank of N.Y.
23 v. Fremont General Corp.,___ F.3d ___, 2008 WL 269458 (9th Cir.
24 2008).

25 The intent requirement is the same for claims of tortious
26 interference with contract as it is for tortious interference
27 with prospective business advantage.  See Korea Supply Co. at
28 1155-1157.

1  However, the California Supreme Court has cautioned against
2  conflating the claims stating, "Our courts should ... firmly
3  distinguish the two kinds of business contexts, bringing a
4  greater solicitude to those relationships that have ripened into
5  agreements, while recognizing that relationships short of that
6  subsist in a zone where the rewards and risks of competition are
7  dominant." Id. at 1157 (quoting Della Penna v. Toyota Motor
8  Sales, U.S.A., 11 Cal. 4th 376, 378 (1995)).  Though Plaintiff
9  can plead both causes of action simultaneously, claims for
10  tortious interference with contract do not require pleading that
11  Defendants' conduct was independently wrongful because
12  "intentionally interfering with a contract is a wrong in and of
13  itself." Id. at 1158.

14      Turning now to the pertinent allegations of Plaintiff's
15  Complaint, Defendants challenge Qwest's TIPEA claim as alleged in
16  Count VIII, arguing that Qwest has failed to identify specific
17  prospective customers with which it had a relationship.  Qwest
18  alleges that it had relationships with prospective customers who
19  were in the market for the services Qwest provides and who had
20  taken steps toward engaging Qwest.  Therefore, Qwest alleges that
21  it had existing relationships with a finite group of potential
22  customers sufficient to state a viable cause of action.

23      Qwest's allegations in that regard are more substantial than
24  those rejected in Janda v. Madera Community Hosp. 16 F. Supp. 2d
25  1181, 1189 (E.D. Cal. 1998).  In that case, the court dismissed
26  the plaintiff's TIPEA claim because he alleged only that the
27  defendants had interfered with his relationship with "'future'
28  lost patients." Id.

Qwest's allegations differ because Qwest actually pointed
Defendants to prospective customers with whom Qwest had already
engaged in some form of relationship.  The pool of parties in the
market for Qwest's services is much smaller than the pool in the
market for a doctor's services.  Additionally, Qwest alleges that
Herakles, as manager of the Data Center, has access to the list
of prospective customers via the visitor logs.  Therefore,
Qwest's allegations are sufficient to satisfy its obligations
under Rule 8, and Defendants' Motions to Dismiss Count VIII are
accordingly DENIED.

Defendants also challenge Qwest's TIC claim against all
Defendants (Count IX, for alleged interference with current
customer relationships) for failure to identify any specific
current customers.  However, again for the purposes of Rule 8, it
is sufficient that Plaintiff identified "third party customers."
See Id.  Qwest's allegations point Defendants to a discrete group
of third parties with which Qwest had already contracted.
Additionally, Qwest again alleges that Herakles would have known
of Qwest's contracts with its customers via information gleaned
from its position as manager of the Data Center.  Finally, Qwest
alleges that Herakles' actions caused at least one of Qwest's
customers to breach its agreement with Qwest.  Therefore, Qwest
met its pleading burden as to Count IX and Defendants' Motions to
Dismiss that Count are DENIED.

Finally, Defendants challenge Qwest's allegation that
Herakles interfered with the Lease, as stated in Count X.  Qwest
specifically repeated and realleged each and every one of the
Complaint's prior allegations into this Count.

1  Therefore, Qwest alleges that Herakles, Sandy Beaches, and

2  Riptide are alter egos of one another while it simultaneously

3  argues that Herakles interfered with the Sandy Beaches' Lease.

4       However, "[t]he tort duty not to interfere with contract

5  falls only on strangers." Applied Equip. at 514.  A party to the

6  contract cannot be held liable for tortious interference with

7  that contract.  Id.  Herakles could not, as a matter of law,

8  interfere with a contract to which it is alleged to be a party.

9       Qwest finds no relief in its argument that it is pleading in

10 the alternative.  Though Plaintiff is correct that it could plead

11 alternative and inconsistent theories for relief, Plaintiff

12 failed to do so here.  "Inconsistent allegations can be made in

13 separate claims or defenses under Federal Rule of Civil Procedure

14 8(e)(2), but no authority is known...which permits blowing hot

15 and cold in the same cause of action."[5]  Steiner v. Twentieth

16 Century-Fox Film Corp., 140 F. Supp. 906, 908 (D.C. Cal. 1953);

17 See also Friendship Medical Center, Ltd. v. Space Rentals,

18 62 F.R.D. 106 (N.D. Ill. 1974).

19      Qwest inadvertently acknowledges its pleading failure in its

20 Opposition to the Defendants' Motions to Dismiss.  Qwest

21 addresses an unpublished case raised by Herakles and states that

22 because that plaintiff had included allegations of alter ego in

23 every cause of action, it was appropriate for the court to

24 dismiss.  See Rachford v. Air Line Pilots Ass'n, Int'l, 2006 WL

25 1699578 (N.D. Cal. 2006).

26

27          [5] This case was decided under a prior version of Rule 8.
   However, the most recent amendments were stylistic only and did
28 not affect the substance of the Rule.

1  Qwest cannot avoid the fact that it similarly incorporated its

2  alter ego allegations into Count X, thereby depriving itself of

3  its own cause of action.  Qwest's claim against Herakles cannot

4  stand, and Defendant's Motion to Dismiss that claim will be

5  GRANTED, with leave to amend.

6

7          **7.   Count XI - Unjust Enrichment (Against Herakles/All**

8               **Defendants)**

9       Defendants are correct that "[u]njust enrichment is not a

10  cause of action...or even a remedy, but rather 'a general

11  principle, underlying various legal doctrines and remedies....It

12  is synonymous with restitution." McBride v. Boughton, 123 Cal.

13  App. 4th 379, 387 (1st Dist. 2004) (quoting Melchior v. New Line

14  Productions, Inc., 106 Cal. App. 4th 779, 793 (2d Dist. 2003)).

15  Indeed, "[u]njust enrichment has...been characterized as

16  describing 'the result of a failure to make restitution....'"

17  Id. (quoting Dunkin v. Boskey, 82 Cal. App. 4th 171, 198 n.15

18  (1st Dist. 2000)).

19       However, this Court must "ignore [e]rroneous or confusing

20  labels...if the complaint pleads facts which would entitle the

21  plaintiff to relief." McBride (quoting Saunders v. Cariss, 224

22  Cal. App. 3d 905, 908 (4th Dist. 1990)).  The court in McBride

23  looked "to the actual gravamen of [the] complaint to determine

24  what cause of action, if any, [was] stated, or could have [been]

25  stated if given leave to amend.  In accordance with this

26  principle, [the court] construed [the] purported cause of action

27  for unjust enrichment as an attempt to plead a cause of action

28  giving rise to a right to restitution." Id. at 387-388.

                              26

1   This construction is consistent with the liberal pleading

2   standards embodied in Rule 8.  See Ritchie v. United Mine Workers

3   of America, 410 F.2d 827, 832 (6th Cir. 1969) ("The designation

4   of counts is not controlling of the interpretations to be placed

5   on these claims.").  "A pleading, according to the liberal

6   concepts of Rule 8, is to be judged by its substance rather than

7   by its form or label."  In re Blewett, 14 B.R. 840, 842 (9th Cir.

8   1981).  "It would be improper to dismiss a claim which raises a

9   cognizable cause of action where that claim is mislabeled."  Id.

10  (quoting Voytko v. Ramada Inn of Atlantic City, 445 F. Supp. 315,

11  325 (D.C.N.J. 1978)).[6]

12  "There are several potential bases for a cause of action

13  seeking restitution.  For example, restitution may be awarded in

14  lieu of breach of contract damages when the parties had an

15  express contract, but it was procured by fraud or is

16  unenforceable or ineffective for some reason."  McBride at 388.

17  "Alternatively, restitution may be awarded where the defendant

18  obtained a benefit from the plaintiff by fraud, duress,

19  conversion, or similar conduct.  In such cases, the plaintiff may

20  choose not to sue in tort, but instead to seek restitution on a

21  quasi-contract theory."  Id.

22  Riptide challenges this Count, arguing that it is

23  inconsistent with Qwest's allegations that the parties expressly

24  contracted with one another.  Riptide Motion to Dismiss, 3:8-13,

25  12:11-15.  "Under California law, unjust enrichment is an action

26  in quasi-contract.

27

28      [6] Voytko cited a prior version of Rule 8, but the subsequent
    amendments to the Rule have merely been in form, not substance.

27

An action based on quasi-contract cannot lie where a valid express covering the same subject matter exists between the parties." Gerlinger v. Amazon.com, Inc., 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004); see also Kessler v. Sapp, 169 Cal. App. 2d 818, 824 (2d Dist. 1959).

Plaintiff again argues that it is pleading in the alternative.  However, "[e]ven though Rule 8(e)(2)...allows a party to state multiple, even inconsistent claims, it does not alter a substantive right between the parties and accordingly does not allow a plaintiff [to invoke] state law to an unjust enrichment claim while also alleging an express contract." Gerlinger at 856.  Since Qwest incorporated all prior allegations, including those stating that the parties expressly contracted with one another, into its claim for restitution, Count XI must fail.  The Defendants' Motions to Dismiss Count XI are GRANTED, with leave to amend.

### 8.   Count XII - Civil Conspiracy (Against All Defendants)

"[C]ivil conspiracy is not a separate and distinct cause of action under California law." Accuimage Diagnostics Corp. v. Terarecon, Inc., 260 F. Supp. 2d 941, 947 (N.D. Cal. 2003).  "To state a cause of action for conspiracy, the complaint must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts.

///
///

1   General allegations of agreement have been held sufficient, and

2   the conspiracy averment has even been held unnecessary, providing

3   the unlawful acts or civil wrongs are otherwise sufficiently

4   alleged." <u>Chicago Title</u> at 316.

5        "The conspiracy 'may be inferred from the nature of the acts

6   done, the relations of the parties, the interests of the alleged

7   conspirators, and other circumstances." <u>Id</u>. (internal quotations

8   and citations omitted).  "As long as two or more persons agree to

9   perform a wrongful act, the law places civil liability for the

10  resulting damages on all of them, regardless of whether they

11  actually commit the tort themselves.  The effect of

12  charging...conspiratorial conduct is to implicate all...who agree

13  to the plan to commit the wrong as well as those who actually

14  carry it out." <u>Wyatt v. Union Mortgage Co.</u>, 24 Cal. 3d 773, 784

15  (1979) (internal citations and quotations omitted).

16       Nevertheless, it is logical that a party cannot conspire

17  with itself.  <u>See</u> <u>Webber v. Inland Empire Investments</u>, 74 Cal.

18  App. 4th 884, 910 (4th Dist. 1999) ("If [the defendant] was the

19  alter ego of all the corporations, there could be no

20  coconspirators.")  As in Count XI, Qwest incorporated its alter

21  ego allegations into this claim, ultimately sabotaging its

22  viability because of those allegations.

23       Hence, Defendants' Motions to Dismiss Count XII are GRANTED,

24  with leave to amend.

25  ///

26  ///

27  ///

28  ///

### 9.   Count XIII - Aiding and Abetting (Against All Defendants)

"Liability may ... be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person. Mere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting.  As a general rule, one owes no duty to control the conduct of another...." Fiol v. Doellstedt, 50 Cal. App. 4th, 1318, 1326 (2d Dist. 1996) (internal citations and quotations omitted).

The very elements of this cause of action show that, as in Counts X and XII, a party cannot aid and abet itself.  The cause of action presumes the presence of more than one party.  Since Plaintiff incorporated its alter ego allegations into this cause of action, it defeated its own argument.  Hence, Defendants' Motions to Dismiss Count XIII are GRANTED, with leave to amend.

///
///
///
///
///
///
///
///

30

**CONCLUSION**

Pursuant to Rule 12(b)(6), Defendants' Motions to Dismiss Counts I-IV and VI-IX are DENIED and Defendants' Motions to Dismiss Counts V and X-XIII are GRANTED with leave to amend.[7] Plaintiff is directed to file a Second Amended Complaint, should he choose to do so, not later than thirty (30) calendar days following the date of this Order.

IT IS SO ORDERED.

Dated: March 20, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[7] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefing.  E.D. Cal. Local Rule 78-230(h).

31