UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

QWEST COMMUNICATIONS                     No. 2:07-cv-00393-MCE-KJM
CORPORATION,

        Plaintiff,

    v.                                   MEMORANDUM AND ORDER

HERAKLES, LLC, et al,

        Defendants.


----oo0oo----


    Through the present action, Plaintiff Qwest Communications
Corporation ("Qwest") seeks damages from Defendants Herakles, LLC
("Herakles"), Sandy Beaches I LP ("Sandy Beaches"), Riptide I LP
("Riptide"), Capital Lease Funding, Inc., and Capital Lease
Funding, LP for deceptive advertising, breach of contract,
constructive fraud and breach of fiduciary duty, statutory and
common law unfair competition, tortious interference with both
prospective economic advantage and with contract, unjust
enrichment, civil conspiracy, and aiding and abetting.
///

1

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Capital Lease Funding, Inc., and Capital Lease Funding LP (hereinafter collectively referred to as "CapLease Defendants") filed the present Motion to Dismiss all Counts for failure to state a claim.  As set forth below, that Motion will be granted.

**BACKGROUND**[1]

This action arises from the circumstances surrounding the performance of three contracts, which governed the construction, occupation, and management of a Data Center in Sacramento, California.  Originally, Qwest and Wavve Telecommunications, Inc. ("Wavve") contemplated entering only one agreement to achieve the same purpose.  However, when the now defunct Wavve was unable to obtain financing from the CapLease Defendants, the parties restructured their arrangement via the three current contracts. First, Qwest leased the Data Center from Sandy Beaches ("Lease"). Next, Qwest subleased a portion of the Data Center to Riptide ("Sublease"), and then Qwest entered a Real Estate Services Agreement ("RESA") with Wavve for the management of Qwest's portion of the Data Center.

///
///
///

_____

[1] This section is derived from the allegations in Plaintiff's Complaint, and is largely identical to that included within the Court's concurrently filed Memorandum and Order adjudicating the Motions to Dismiss filed on behalf of the other Defendants to the instant lawsuit.  It is repeated here for purposes of clarity.

1    Riptide subsequently assigned its rights in the Sublease to
2    Herakles.  Wavve assigned its rights in the RESA to Surferr LLC,
3    an entity alleged to be related to Herakles, Sandy Beaches, and
4    Riptide.  Surferr LLC then assigned its rights in the RESA to
5    Riptide, who subsequently re-assigned those rights to Herakles.
6    Qwest alleges that Herakles is now both its competitor and
7    sublessor tenant, as well as the manager of Qwest's portion of
8    the Data Center.

9    The Lease terms extend for a period of ten years, with the
10   option to renew for another nine.  Qwest uses the leased space to
11   provide co-location, data center, telecommunications, internet
12   access, content hosting, network management, and internet
13   security services.  The Lease provides for a "Tier IV data
14   center" with 99.999% operational availability and contains a
15   confidentiality clause, which, according to Qwest, Sandy Beaches
16   has violated.

17   Qwest alleges that the RESA requires Herakles to act as
18   Qwest's "exclusive agent" in managing the Data Center and Qwest
19   further alleges that the parties agreed that the Data Center
20   manager would be the "face of Qwest" to Qwest's customers and
21   potential customers.  However, Qwest now claims that, instead,
22   Herakles, as the current manager, diverted customers from Qwest
23   to itself, in its separate capacity as Qwest's sublessor.

24   Qwest also claims that Herakles engaged in deceptive
25   advertising by making statements purporting to be the Data Center
26   owner on the Herakles website and within the Data Center.
27   ///
28   ///

1  Additionally, Qwest alleges that Herakles misrepresented the

2  property in Data Center sign-in sheets by omitting Qwest's name

3  on the logs and that Herakles took Qwest's proprietary customer

4  and potential customer information.

5      Qwest further states that Herakles has failed to perform

6  certain construction work as obligated under the RESA and that,

7  in its capacity as sublessor, Herakles has failed to hire a

8  required third-party manager for its own portion of the Data

9  Canter. Instead, despite being a competitor of Qwest, Herakles

10 allegedly manages both the Qwest facility and its own facility,

11 to save itself added management costs.

12     Finally, Qwest alleges that Herakles, Riptide, Sandy Beaches

13 and the CapLease Defendants are alter egos of one another.  Qwest

14 alleges that the Defendants have common ownership, use one

15 company as a conduit for another, and share offices, employees,

16 and bank accounts.  Qwest alleges that this practice enables

17 Herakles to breach its contract without liability, all the while

18 collecting Qwest's rent payments through Sandy Beaches and

19 diverting customers to itself.

20     The CapLease Defendants have filed the present Motion to

21 Dismiss Qwest's Complaint pursuant to Rule 12(b)(6), on five

22 distinct grounds:

23     1.   Allegations against unspecified "defendants" do not

24 state a claim against CapFunding Defendants.

25     2.   Qwest fails to adequately plead alter ego liability

26 against the CapFunding Defendants.

27     3.   Many of the claims involve contracts to which the

28 CapFunding Defendants are not a party.

4

1    4.   Disclosure of confidential information is required by

2 federal securities law.

3    5.   Qwest does not establish a fiduciary duty in support of

4 its claim for constructive fraud and/or breach of duty.

5

6                              **STANDARD**

7    **A.   Motion to Dismiss under Rule 12(b)(6)**

8

9 On a motion to dismiss for failure to state a claim under Rule

10 12(b)(6), all allegations of material fact must be accepted as

11 true and construed in the light most favorable to the nonmoving

12 party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th

13 Cir. 1996).  Rule 8(a)(2) requires only "a short and plain

14 statement of the claim showing that the pleader is entitled to

15 relief" in order to "give the defendant fair notice of what

16 the...claim is and the grounds upon which it rests."  Bell Atl.

17 Corp. v. Twombly, --- U.S. ----, 127 S. Ct. 1955, 1964 (2007)

18 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  While a

19 complaint attacked by a Rule 12(b)(6) motion to dismiss does not

20 need detailed factual allegations, a plaintiff's obligation to

21 provide the "grounds" of his "entitlement to relief" requires

22 more than labels and conclusions, and a formulaic recitation of

23 the elements of a cause of action will not do.  Id. at 1964-65

24 (internal citations and quotations omitted).  Factual allegations

25 must be enough to raise a right to relief above the speculative

26 level.

27 ///

28 ///

1   Id. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and

2   Procedure § 1216, pp. 235-36 (3d ed. 2004) ("The pleading must

3   contain something more...than...a statement of facts that merely

4   creates a suspicion [of] a legally cognizable right of action")).

5       A court granting a motion to dismiss a complaint must then

6   decide whether to grant leave to amend.  A court should "freely

7   give[]" leave to amend when there is no "undue delay, bad

8   faith[,] dilatory motive on the part of the movant,...undue

9   prejudice to the opposing party by virtue of...the amendment,

10  [or] futility of the amendment...."  Fed. R. Civ. P. 15(a); Foman

11  v. Davis, 371 U.S. 178, 182 (1962).  Generally, leave to amend is

12  denied only when it is clear the deficiencies of the complaint

13  cannot be cured by amendment.  DeSoto v. Yellow Freight Sys.,

14  Inc., 957 F.2d 655, 658 (9th Cir. 1992).

15

16      **B.    General Pleading Requirements**

17

18      "Rule 8(a)(2)...requires a 'showing,' rather than a blanket

19  assertion of entitlement to relief.  Without some factual

20  allegation in the complaint, it is hard to see how a claimant

21  could satisfy the requirements of providing not only 'fair

22  notice' of the nature of the claim, but also 'grounds' on which

23  the claim rests."  Id. at 1965 n.3. (Factual allegations

24  necessary to plead "grounds" on which claim rests.)

25      A pleading must contain  "only enough facts to state a claim

26  to relief that is plausible on its face."  Id. at 1974.  If the

27  "plaintiffs...have not nudged their claims across the line from

28  conceivable to plausible, their complaint must be dismissed."

6

1  <u>Id</u>.   Nevertheless, "[a] well-pleaded complaint may proceed even
2  if it strikes a savvy judge that actual proof of those facts is
3  improbable, and 'that a recovery is very remote and unlikely.'"
4  <u>Id</u>. at 1965.

5

6                              **ANALYSIS**

7  **A.   The CapLease Defendants' Alter Ego Liability**

8

9       "A basic tenet of American corporate law is that the
10 corporation and its shareholders are distinct entities." <u>Dole</u>
11 <u>Food Co. v. Patrickson</u>, 538 U.S. 468, 474 (2003).  However, alter
12 ego liability provides a means to pierce the corporate veil for
13 purposes of imposing liability on a defendant for an underlying
14 cause of action.  <u>See</u> <u>Dion LLC, v. Infotek Wireless, Inc.</u>, 2007
15 WL 3231738 at *3 (N.D. Cal. Oct. 30, 2007) (quoting <u>Local 159 v.</u>
16 <u>Nor-Cal Plumbing, Inc.</u>, 185 F.3d 978, 985 (9th Cir. 1999)).

17      The alter ego determination is an equitable one within the
18 province of the trial court.  <u>Assoc. Vendors, Inc., v. Oakland</u>
19 <u>Meat Co., Inc.</u>,  210 Cal. App. 2d 825, 837 (1st Dist. 1962).
20 Decisions are necessarily fact-dependent and "vary according to
21 the circumstances in each case."  <u>Id</u>. (internal quotations
22 omitted).  Nevertheless, the general requirements for proving
23 liability are "1) that there be such unity of interest and
24 ownership that the separate personalities of the corporation and
25 the individual no longer exist, and 2) that, if the acts are
26 treated as those of the corporation alone, an inequitable result
27 will follow."  <u>Id</u>. at 813.
28 ///

                                  7

1  "Bad faith in one form or another is an underlying consideration

2  and will be found in...those cases wherein the trial court was

3  justified in disregarding the corporate entity." Id. at 838.

4       Among the factors supporting a "unity of interest" finding

5  are "financial issues (e.g., was the corporation adequately

6  capitalized?); corporate formality questions (e.g., was stock

7  issued, are minutes kept and officers and directors elected, are

8  corporate records segregated?); ownership issues (e.g., what is

9  the stock ownership picture?); commingling issues (e.g., are

10  corporate assets commingled, does the parent company merely use

11  the corporate shell of the subsidiary to obtain goods and

12  services for the parent company?); etc." Tomaselli v.

13  Transamerica Ins. Co., 25 Cal. App. 4th 1269, 128 n.13. (citing

14  Assoc. Vendors, Inc. at 837-842).  Notably, "[t]he mere fact of

15  sole ownership and control does not eviscerate the separate

16  corporate identity that is the foundation of corporate law."

17  Katzir's Floor and Home Design, Inc. V. M-MLS.com, 394 F.3d 1143,

18  1149 (9th Cir. 2004)(citing Dole Food Co. at 475).

19       Under the second prong of the doctrine, "[a]lter ego

20  is...invoked only where recognition of the corporate form would

21  work an injustice to a third person."  Id. (quoting Tomaselli at

22  1285).  "The injustice that allows a corporate veil to be pierced

23  is not a general notion of injustice; rather, it is the injustice

24  that results only when corporate separateness is illusory."

25  Katzir's Floor and Home Design at 1149.

26  ///

27  ///

28  ///

8

Facts relevant to the "injustice" inquiry include "inadequate capitalization, commingling of assets, [a] disregard of corporate formalities...[and] any other facts which demonstrate the critical element: that an inequitable result would have followed." <u>Tomaselli</u> at 1285.

Conclusory allegations are not sufficient to support an alter ego finding. <u>Hokama v. E.F. Hutton & Co., Inc.</u>, 566 F. Supp. 636, 647 (D.C. Cal. 1983); <u>Maganallez v. Hilltop Lending Corp.</u>, 505 F. Supp. 2d 594, 607 (N.D. Cal. 2007). In <u>Brennan v. Concord EFS, Inc.,</u> the Northern District determined that a statement alleging only that "Bank One exercised such dominion and control over Bank One, NA and Bank One Arizona that it [was] liable according to the law for the acts of Bank One" was an inadequate legal conclusion. 369 F. Supp. 2d 1127, 1136 (N.D. Cal. 2005).

Similarly, in <u>Nordberg v. Trilegiant Corp.</u>, the Northern District granted a motion to dismiss, stating that allegations of "routine control by a parent [were] insufficient to support the contention that a subsidiary is a mere instrumentality." 445 F. Supp. 2d 1082, 1102 (N.D. Cal. 2006). Additionally, in <u>Long v. Postorivo</u>, the plaintiffs' allegations "that Postorivo was the founder and former CEO and president of National...that Postorivo worked 'in close coordination' with National, ... that Postorivo personally assured [plaintiff] of the success of their business transactions," and that defendant sold off corporate assets to prevent recovery were "only slightly beyond conclusory" and insufficient to withstand defendants' motion for judgment on the pleadings. 2007 WL 2990457 at *1-2 (N.D. Cal. 2007).

9

1    Other plaintiffs, however, have met the minimum factual

2  pleading threshold.  In <u>Maganallez v. Hilltop Lending Corp.</u>, the

3  Northern District found the following allegations sufficient to

4  allege alter ego liability:

5        "[Hilltop Lending] was inadequately capitalized, failed
         to maintain corporate formalities and was designed to
6        limit the liability of Nguyen.  There was such a unity
         of interest and ownership between Nguyen and [Hilltop
7        Lending] that the individuality and separateness of
         Nguyen and [Hilltop Lending] has ceased to exist and
8        adherence to the fiction of the separate existence of
         [Hilltop Lending] would sanction fraud and promote
9        injustice."

10 505 F. Supp. 2d 594, 607 (N.D. Cal. 2007).

11   Likewise, in <u>In re Napster, Inc. Copyright Litigation</u>, the

12 allegation that the defendant exercised "essentially full

13 operational control" over Napster was sufficient to withstand a

14 motion to dismiss.  354 F. Supp. 2d 1113, 1122 (N.D. Cal. 2005).

15 Furthermore, in <u>Dion LLC v. Infotek Wireless, Inc.</u>, the plaintiff

16 successfully alleged that

17       "[t]he unity of interest and ownership between [the
         defendants]...prevented the two from functioning as
18       separate entities...[The two companies] conduct[ed] the
         same type of business, shared the same office space,
19       used the same business address, and had the same
         bookkeeper, lawyers and CPA...[I]t would be inequitable
20       to allow [the defendant] to now assert a distinction
         between the corporations to avoid liability."
21

22 2007 WL 3231738 at *3 (N.D. Cal. 2007).

23   Plaintiff's allegations against the CapLease Defendants fall

24 well short of the necessary mark to survive a motion to dismiss.

25 The totality of Qwest's independent allegations against the

26 CapLease Defendants are as follows:

27 ///

28 ///

The CapLease Defendants were, during all times relevant to the Complaint, the agent, alter ego, subsidiary and/or division of Herakles, Sandy Beaches, and/or Riptide.  Compl., ¶ 9.

Wavve needed to obtain additional financing from the Capital Lease Funding Defendants, which resulted in a change to the contemplated arrangement between Qwest and Waave.  Compl., ¶ 14.

The Capital Lease Funding Defendants then disclosed or caused to be disclosed th[e] information in numerous filings with the United States Securities & Exchange Commission, including in its Form S-11, Registration Statement, and Amendments thereto, filed in 2003 and 2004, as well as its Prospectus, dated March 19, 2004, and at least one Prospectus for asset-backed securities offered by First Union Commercial Mortgage Securities, Inc.  Compl., ¶ 49.

The Defendants share common officers and directors...As a[n]...example, William Pollert and Shawn Seal of Capital Lease Funding Defendants are also officers of Riptide...On information and belief, the Defendants use the same offices and employees.  For example, on information and belief, some of the senior managers of the Capital Lease Funding Defendants are part owners of the Data Center.  Compl., ¶ 53.

Herakles' responsibilities as a fiduciary of Qwest also extend to each of Herakles' alter egos, Defendants Sandy Beaches, the Capital Lease Funding Defendants, and Riptide.  Compl., ¶ 84.

In support of its alter ego argument, Plaintiff has alleged only that some of the senior managers of CapLease are part owners of the Data Center and that two CapLease officers are also officers of Riptide.  This is insufficient to suggest that Plaintiff will plausibly be able to prove that the CapLease Defendants no longer exist as separate entities from Herakles, Sandy Beaches, and Riptide.  Indeed, even allegations of sole ownership would not be enough.  Plaintiff has pled no other facts indicating financial issues, corporate formality questions, sufficient ownership issues, or commingling issues.

///

11

To the contrary Plaintiff has alleged only that the CapLease
Defendants provided financing to the various other defendants
when Wavve became defunct.  Hence, this Court finds that
Plaintiff's complaint fails to adequately allege alter ego
liability as to the CapLease Defendants.

**B.   Qwest's Claims Against the CapLease Defendants**

Since Plaintiff did not successfully allege any alter ego
liability as to the CapLease Defendants, all of Plaintiff's
claims against these Defendants that necessarily depend on
Qwest's alter ego theory must fail.

"Under California law, only a signatory to a contract may be
liable for any breach." Clemens v. American Warranty Corp., 193
Cal. App. 3d 444, 452 (2d Dist. 1987).  Therefore, because the
CapLease Defendants were not party to the Lease, Sublease, or
RESA, nor were they alter egos of the actual parties, Qwest fails
to state a claim against them for any breach of contract or
breach of any duty arising from such a contract.

Additionally, Plaintiff's remaining factual allegations are
too sparse to support any of its remaining claims, including
those Counts that allege the CapLease Defendants conspired with
or aided and abetted any of the remaining defendants.

Qwest's minimal factual allegations against the CapLease
Defendants are insufficient to state a claim under all Counts.
Hence, the CapLease Defendants' Motion to Dismiss Counts I-IX,
and Counts XI-XIII are well-taken.

///

12

**CONCLUSION**

Pursuant to Rule 12(b)(6), Defendant's Motion to Dismiss Counts I-IX, and Counts XI-XIII is GRANTED with leave to amend.[2] Plaintiff is directed to file a Second Amended Complaint, should it choose to do so, not later than thirty (30) days following the date of this Order.

IT IS SO ORDERED.

Dated: March 20, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[2] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefing.  E.D. Cal. Local Rule 78-230(h).