1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

11 QWEST COMMUNICATION,                    No. 2:07-cv-00393-MCE-KJM

12            Plaintiffs,

13      v.                                  <u>MEMORANDUM AND ORDER</u>

14 HERAKLES, LLC, et al.,

15            Defendants.

16                         ----oo0oo----

17

18      Through the present action, Plaintiff Qwest Communications

19 Corporation ("Qwest") seeks damages from Defendants Herakles, LLC

20 ("Herakles"), Sandy Beaches I LP ("Sandy Beaches"), Riptide I LP

21 ("Riptide"), and Capital Lease Funding, Inc. and Capital Lease

22 Funding, LP (collectively "CapLease Defendants"), for deceptive

23 advertising, breach of contract, constructive fraud and breach of

24 fiduciary duty, statutory and common law unfair competition,

25 tortious interference with both prospective economic advantage

26 and with contract, unjust enrichment, civil conspiracy, and

27 aiding and abetting.

28 ///

1

1    Pursuant to Federal Rule of Civil Procedure 12(b)(6)[1], the

2    CapLease Defendants filed the present Motion to Dismiss all

3    counts as to the CapLease Defendants for failure to state a

4    claim.  As set forth below, the Motion will be DENIED.[2]

5

6                              **BACKGROUND**[3]

7

8    This action arises from the circumstances surrounding the

9    performance of three contracts, which governed the construction,

10   occupation, and management of a data center ("Data Center") in

11   Sacramento, California.  Originally, Qwest and Wavve

12   Telecommunications, Inc. ("Wavve") contemplated entering only one

13   agreement to achieve these objectives.  However, when the now

14   defunct Wavve was unable to obtain financing from the CapLease

15   Defendants, the parties restructured their arrangement via the

16   three current contracts.  First, Qwest leased the Data Center

17   from Sandy Beaches ("Lease").  Next, Qwest subleased a portion of

18   the Data Center to Riptide ("Sublease").  Finally, Qwest entered

19   a Real Estate Services Agreement ("RESA") with Wavve for the

20   management of Qwest's portion of the Data Center.

21   ───────────────

22        [1] Unless otherwise stated, all further references to a Rule
     are to the Federal Rules of Civil Procedure.
23

24        [2] Because oral argument will not be of material assistance,
     the Court orders this matter submitted on the briefs.  E.D. Cal.
25   Local Rule 78-230(h).

26        [3] The factual assertions in this section are based on the
     allegations in Plaintiff's FAC unless otherwise specified, and is
27   largely identical to that included within the Court's
     concurrently filed Memorandum and Order adjudicating the Motion
28   to Dismiss filed on behalf of the other Defendants in the instant
     lawsuit.  It is repeated here for the purposes of clarity.

                                    2

1   Riptide subsequently assigned its rights in the Sublease to

2   Herakles.  Wavve assigned its rights in the RESA to Surferr LLC,

3   an entity alleged to be related to Herakles, Sandy Beaches, and

4   Riptide.  Either Surferr LLC then assigned its rights in the RESA

5   to Riptide, who subsequently re-assigned those rights to

6   Herakles, or Surferr LLC assigned its rights directly to

7   Herakles.  Qwest alleges that Herakles is now both its

8   competitor/sublessor tenant and the manager of Qwest's portion of

9   the Data Center.

10   The Lease terms extend for a period of ten years, with the

11   option to renew for another nine.  Qwest uses the leased space to

12   provide co-location, data center, telecommunications, internet

13   access, content hosting, network management, and internet

14   security services.  The Lease provides for a "Tier IV data

15   center" with 99.999% operational availability and contains a

16   confidentiality clause, which, according to Qwest, Sandy Beaches

17   has violated.

18   Qwest alleges that the RESA and an alleged oral agreement

19   between Qwest and Herakles require Herakles to act as Qwest's

20   "exclusive agent" in managing the Data Center and Qwest further

21   alleges that the parties agreed that the Data Center manager

22   would be the "face of Qwest" to Qwest's customers and potential

23   customers.  However, Qwest claims that, instead, Herakles, as the

24   current manager, diverted customers from Qwest to itself, in its

25   separate capacity as Qwest's sublessor.

26   Qwest also claims that Herakles engaged in deceptive

27   advertising by making statements purporting to be the Data Center

28   owner on the Herakles website and within the Data Center.

3

1    Additionally, Qwest alleges that Herakles misrepresented the
2    property in Data Center sign-in sheets by omitting Qwest's name
3    on the logs and that Herakles took Qwest's proprietary customer
4    and potential customer information.

5        Qwest further states that Herakles has failed to perform
6    certain construction work as obligated under the RESA and that,
7    in its capacity as sublessor, Herakles has failed to hire a
8    required third-party manager for its own portion of the Data
9    Canter.  Instead, despite being a competitor of Qwest, Herakles
10   allegedly manages both the Qwest facility and its own facility,
11   to save itself added management costs.

12       Finally, Qwest alleges that Herakles, Riptide, and Sandy
13   Beaches are alter egos of one another.  Qwest alleges that the
14   Defendants have common ownership, use one company as a conduit
15   for another, and share offices, employees, and bank accounts.
16   Qwest alleges that this practice enables Herakles to breach its
17   contract without liability, all the while collecting Qwest's rent
18   payments through Sandy Beaches and diverting customers to itself.

19       On April 21, 2008, Plaintiff filed its First Amended
20   Complaint ("FAC") in this Court under federal question
21   jurisdiction.  Plaintiff alleges multiple causes of action in its
22   FAC, namely: deceptive advertising, breach of contract,
23   constructive fraud, breach of fiduciary duty, statutory and
24   common law unfair competition, tortious interference with both
25   prospective economic advantage and with contract, unjust
26   enrichment, civil conspiracy, and aiding and abetting.
27   ///
28   ///

1  Plaintiff seeks both compensatory and punitive damages,
2  restitution, disgorgement, specific performance, and statutory
3  attorney's fees and costs.

4      On May 8, 2008, the CapLease Defendants filed this Motion to
5  Dismiss Qwest's Counts I (False Advertising on a conspiracy
6  basis), VIII (Common Law Unfair Competition on a conspiracy
7  basis), X (Tortious Interference with Prospective Economic
8  Advantage on a conspiracy basis), XII (Tortious Interference with
9  Contract on a conspiracy basis), XIV (Tortious Interference with
10 Contract), and XVI (Aiding and Abetting) as to the CapLease
11 Defendants.  The CapLease Defendants challenge Qwest's FAC
12 pursuant to Rule 12(b)(6), asserting that Qwest failed to allege
13 sufficient facts to establish a claim on which relief may be
14 granted.

15

16                                         **STANDARD**
17     **A. Motion to Dismiss Under Rule 12(b)(6)**

18

19     On a motion to dismiss for failure to state a claim under
20 Rule 12(b)(6), all allegations of material fact must be accepted
21 as true and construed in the light most favorable to the
22 nonmoving party.  <u>Cahill v. Liberty Mut. Ins. Co.</u>, 80 F.3d 336,
23 337-38 (9th Cir. 1996).  Rule 8(a)(2) requires only "a short and
24 plain statement of the claim showing that the pleader is entitled
25 to relief," in order to "give the defendant fair notice of what
26 the... claim is and the grounds upon which it rests."  <u>Conley v.</u>
27 <u>Gibson</u>, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).
28 ///

1  While a complaint attacked by a Rule 12(b)(6) motion to dismiss
2  does not need detailed factual allegations, a plaintiff's
3  obligation to provide the "grounds" of his "entitlement to
4  relief" requires more than labels and conclusions, and a
5  formulaic recitation of the elements of a cause of action will
6  not do.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65
7  (2007) (internal citations and quotations omitted).  Factual
8  allegations must be enough to raise a right to relief above the
9  speculative level.  Id. at 1965 (citing 5 C. Wright & A. Miller,
10  Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)
11  ("The pleading must contain something more... than... a statement
12  of facts that merely creates a suspicion [of] a legally
13  cognizable right of action").
14      If the court grants a motion to dismiss a complaint, it must
15  then decide whether to grant leave to amend.  The court should
16  "freely give" leave to amend when there is no "undue delay, bad
17  faith[,] dilatory motive on the part of the movant... undue
18  prejudice to the opposing party by virtue of... the amendment,
19  [or] futility of the amendment...."  Fed. R. Civ. P. 15(a);
20  Foman v. Davis, 371 U.S. 178, 182 (1962).  Generally, leave to
21  amend is only denied when it is clear that the deficiencies of
22  the complaint cannot be cured by amendment.  DeSoto v. Yellow
23  Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992).
24  ///
25  ///
26  ///
27  ///
28  ///

6

**B. General Pleading Requirements**

"Rule 8(a)(2)...requires a 'showing,' rather than a blanket assertion of entitlement to relief.  Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests."  <u>Twombly</u>, 127 S. Ct. at 1965 n.3. (Factual allegations necessary to plead "grounds" on which claim rests.) A pleading must contain "only enough facts to state a claim to relief that is plausible on its face."  <u>Id</u>. at 1974.  If the "plaintiffs...have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." <u>Id</u>.  Nevertheless, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" <u>Id</u>. at 1965.

Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud."  "A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations."  <u>Neubronner v. Milken</u>, 6 F.3d 666, 671-72 (9th Cir. 1993) (internal quotations and citations omitted).  "The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity."  <u>Id</u>. at 672.

///

///

**ANALYSIS**

**1.    Conspiracy (Counts I, VIII, X, and XII)**

"[C]ivil conspiracy is not a separate and distinct cause of action under California law." <u>Accuimage Diagnostics Corp. v. Terarecon, Inc.</u>, 260 F. Supp. 2d 941, 947 (N.D. Cal. 2003). "To state a cause of action for conspiracy, the complaint must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. General allegations of agreement have been held sufficient, and the conspiracy averment has even been held unnecessary, providing the unlawful acts or civil wrongs are otherwise sufficiently alleged." <u>Chicago Title Ins. Co. v. Great Western Financial Corp.</u>, 69 Cal. 2d 305, 316 (Cal. 1968); <u>See also</u> <u>Quelimane Co. v. Stewart Title Guaranty Co.</u>, 19 Cal. 4th 26, 47 (Cal. 1998) (citing <u>Chicago Title</u>, 69 Cal. 2d at 316).

"The conspiracy 'may be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." <u>Chicago Title</u>, 69 Cal. 2d at 316 (internal quotations and citations omitted). "As long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damages on all of them, regardless of whether they actually commit the tort themselves. The effect of charging ... conspiratorial conduct is to implicate all ... who agree to the plan to commit the wrong as well as those who actually carry it out."
///

8

_Wyatt v. Union Mortgage Co._, 24 Cal. 3d 773, 784 (1979) (internal citations and quotations omitted).

The CapLease Defendants assert that Qwest's conspiracy allegations fail because, even if taken as true, they do not show concerted wrongful action or illicit agreement by the CapLease Defendants. The CapLease Defendants note that "concerted wrongful action" is the basis for conspiracy liability, and claim that Qwest has pled none. _Janken v. GM Hughes Electronics_, 46 Cal. App. 4th 55, 78 (2d Dist. 1996). The CapLease Defendants also assert that Qwest's allegations are legal conclusions, which are thus insufficient to give the required factual support to Qwest's claims.

However, Qwest's FAC alleges that the CapLease Defendants agreed with Herakles to increase revenue and reduce costs of the Data Center by alleged wrongful conduct such as false advertising under the Lanham Act (Count I), unfair competition (Count VIII), and tortious interference with prospective economic advantage and contract (Counts X and XII - customer contracts). In its prior Order, this Court held that Qwest's allegations within these Counts of the wrongful acts committed by Herakles and the other Defendants and Qwest's resulting damage was sufficient to state a claim, and thus the only remaining element at issue is the "formation and operation of the conspiracy." _Chicago Title_, 69 Cal. 2d at 316.

To provide factual support to its allegations, Qwest points to a memorandum ("Memo") allegedly sent from the CapLease Defendants to Herakles:

///

1     ...advising generous bonuses be paid to Herakles' Lou
2     Kirchner for bringing in customers (which CapLease knew
      was possible only if Herakles competed with Qwest
3     contrary to its obligations under the RESA) and for
      keeping the Data Center costs tight (which CapLease
4     knew was only possible by Herakles' actions that
      prevented Qwest from obtaining the benefits of the
5     Lease and the RESA, namely to have a manager for
      serving Qwest's customers, and the rights given to
6     Qwest concerning the build-out, power, and cooling
      requirements).

7     See FAC ¶¶ 58, 188.  Further, Qwest notes in its Opposition that

8     the Memo also includes comments by the CapLease Defendants

9     stating that "our worst-case scenario would be if Qwest were to

10    rent the West colo. to one large customer and draw its full power

11    allotment."[4]  Qwest alleges that this Memo evidences the CapLease

12    Defendants' agreement with Herakles to unlawfully deprive Qwest

13    of its rights under the RESA, and shows the CapLease Defendants'

14    direct involvement in Data Center operations in furtherance of

15    the alleged conspiracy.  Thus, an inference of alleged conspiracy

16    based on the acts of the parties involved is proper.  Chicago

17    Title, 69 Cal. 2d at 316.

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25

26         [4] The CapLease Defendants provided the Memo to this Court in
27    their Request for Judicial Notice.  This Court reviews the Memo
      for the purpose of this Motion to Dismiss as its content was
28    alleged in the FAC, and construes all facts in the manner most
      favorable to Qwest.

                                    10

1    This inferential understanding of the pleading requirements

2    of a conspiracy allegation has held fast following the Supreme

3    Court's holding in <u>Twombly</u>.[5]   <u>See, e.g.</u>, <u>Franklin v. Allstate</u>

4    <u>Corp.</u>, 2007 WL 1991516, at *7 (N.D. Cal. 2007) (noting that a

5    plaintiff is not required to allege specific facts with respect

6    to the formation of the alleged conspiracy; "it is sufficient to

7    allege facts from which the existence of a conspiracy may be

8    inferred").   Therefore, Qwest's pleading of the CapLease

9    Defendants' conspiracy with Herakles is "enough to raise a right

10   to relief above the speculative level."[6]   <u>Bell Atl. Corp. v.</u>

11   <u>Twombly</u>, 127 S. Ct. 1955, 1965 (2007).   Accordingly, the CapLease

12   Defendants' Motion to Dismiss Counts I, VIII, X, and XII is

13   DENIED.

14   ///

15   ///

16   ///

17

18      [5] The cases cited by CapLease as countering inferential
     pleading in a conspiracy action are each distinguishable from the
19   instant case, and thus are of no consequence.  <u>Love v. The Mail</u>
     <u>on Sunday</u>, 2006 WL 4046180, at *15 (C.D. Cal. 2006) (pleading
20   failed because plaintiff alleged no facts in support of
     conspiracy allegation); <u>Orloff v. Metropolitan Trust Co.</u>, 17
21   Cal. 2d 484, 488, (Cal. 1941) (pleading failed because it lacked
     an allegation of damage); <u>Kidron v. Movie Acquisition Corp.</u>, 40
22   Cal. App. 4th 1571, 1582 (2nd Dist. 1995) (affirming nonsuit
     where plaintiff failed to prove participation or interest in the
23   commission of the offense).

24      [6] The CapLease Defendants are correct in asserting that
     Qwest's inclusion in its Opposition of a document, not referenced
25   in Qwest's FAC, is improper, and this Court will disregard this
     document for the purpose of this Motion to Dismiss.  <u>Lee v.</u>
26   <u>County of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001)
     (complaint includes documents physically attached to the
27   complaint, or necessarily relied on by the complaint and whose
     authenticity is not contested); <u>Clegg v. Cult Awareness Network</u>,
28   18 F.3d 752, 754-55 (9th Cir. 1994) (noting that review under a
     motion to dismiss is limited to the contents of the complaint).

1        **2.    Tortious Interference with Contract (Count XIV - Lease)**

2

3        In order for Qwest to properly allege tortious interference

4   with contract ("TIC"), Qwest must show 1) the existence of a

5   valid contract between Qwest and a third party; (2) the CapLease

6   Defendants' knowledge of that contract; (3) the CapLease

7   Defendants' intentional acts designed to induce a breach or to

8   disrupt the contractual relationship, (4) actual breach or

9   disruption of the contractual relationship, and (5) resulting

10  damage.  <u>Bank of New York v. Fremont General Corp.</u>, 523 F.3d 902,

11  909 (9th Cir. 2008).  As noted in this Court's Order, Qwest need

12  not prove that the CapLease Defendants specifically intended to

13  interfere with the Lease, but must show that they "knew that the

14  interference was certain or substantially certain to occur as a

15  result of [their] action[s]."  <u>Korea Supply Co. v. Lockheed

16  Martin Corp.</u>, 29 Cal. 4th 1134, 1154 (2003).  Further, Qwest's

17  claims of TIC do not require pleading that the CapLease

18  Defendants' conduct was independently wrongful because

19  "intentionally interfering with a contract is a wrong in and of

20  itself."  <u>Id</u>. at 1158.

21       Qwest asserts that it sufficiently alleged each element of

22  TIC.  First, Qwest alleged the existence of the Lease between

23  Qwest and Sandy Beaches, and incorporated the Lease into the FAC

24  by attachment.  Second, Qwest alleged that the CapLease

25  Defendants were aware of the Lease.

26  ///

27  ///

28  ///

1   Third, Qwest alleged the CapLease Defendants tortiously induced
2   breach of the Lease by causing Sandy Beaches to "breach the
3   confidentiality provisions of the Lease by publicly disclosing
4   the existence of and terms and conditions of the Lease."  FAC at
5   ¶ 167.  Fourth, Qwest alleged the actual breach of the
6   confidentiality provisions of the Lease by stating that the
7   CapLease Defendants "disclosed or caused to be disclosed this
8   information in numerous filings with the United States Securities
9   & Exchange Commission, including in its Form S-11...." Id. at
10  ¶ 54(b).  Further, Qwest alleges Sandy Beaches failed to request
11  or obtain permission from Qwest for such disclosure as required
12  under the Lease, and the CapLease Defendants similarly failed to
13  obtain permission from Qwest.  Id.  Finally, Qwest alleged the
14  CapLease Defendants' interference "continues to injure Qwest,"
15  that Qwest "has no adequate remedy at law for the irreparable
16  harm," and that Qwest will prove the amount of damages, to the
17  extent possible, at trial.  Id. at ¶ 168.

18      The CapLease Defendants challenge Qwest's allegations of TIC
19  on three grounds: 1) that Qwest does not mention how the CapLease
20  Defendants tortiously interfered with the Lease; 2) that Qwest
21  failed to allege how its damage under this Count resulted from
22  the CapLease Defendants' actions; and 3) that the securities laws
23  require the disclosure of the Lease terms, and therefore no
24  liability can flow from the alleged disclosure.

25      Qwest's allegations in paragraphs 54 and 167 of the FAC are
26  sufficient to show intentional acts by the CapLease Defendants
27  designed to induce a breach of the Lease.
28  ///

13

1   Qwest alleges that the CapLease Defendants received a copy of the
2   Lease from Sandy Beaches, and thus it is reasonable to infer that
3   the CapLease Defendants were aware of the confidentiality
4   provisions when they allegedly disclosed or caused to be
5   disclosed the existence of the terms and conditions of the Lease.
6   This inference lends sufficient support to the requirement that
7   the CapLease Defendants "knew that the interference was certain
8   or substantially certain to occur as a result of [their]
9   action[s]."  Korea Supply, 29 Cal. 4th at 1154.  While the
10  CapLease Defendants conclude that Qwest's allegations are
11  insufficient to show an "intentional act designed to induce a
12  breach or to disrupt the contractual relationship," they fail to
13  explain their reasoning.

14       Qwest's allegations of damage are similarly sufficient.
15  Qwest alleged in paragraphs 167 and 168 that the CapLease
16  Defendants' wrongful interference with the Lease through the
17  disclosure of confidential information "continues to injure
18  Qwest."  Qwest claims both irreparable harm and possible damages
19  to be proven at trial.  Id. at ¶ 168.  As with the other Counts
20  held sufficient by this Court, Qwest adequately claims damages
21  resulting from the alleged acts of the CapLease Defendants, and
22  thus the CapLease Defendants' second argument fails.

23       Finally, the CapLease Defendants challenge Qwest's
24  allegations based on the disclosure of confidential information
25  to the SEC.  The CapLease Defendants assert that Qwest's use of
26  this disclosure as a basis for liability is faulty, because the
27  disclosure is legally required, and thus falls within an exception
28  contained in the confidentiality provision of the lease.

14

The Lease provides for the disclosure of confidential information, as required by law, with certain restrictions.  Section 15.8(6) of the Lease states:

> Without the prior consent of the other party, neither party shall disclose to any third person ... the existence or purpose of this Agreement, the terms and conditions hereof ... except as may be required by law, regulation or court or agency order or demand, and then only after prompt prior notification to the other party of such required disclosure.[]  Qwest's remedy for any violation of this Section 15.8(6) shall not include termination of this Agreement or abatement of Rent.

See FAC Exhibit B 15-16.

The Securities Act of 1933 calls for a description of a company's business, information about the management structure of the company, a description of the security offered for sale, financial statements certified by independent accountants and a list of company property.  See generally 17 C.F.R. §§ 230.400-230.494.  Form S-11, a registration filing required for real estate holding companies, is more detailed, and is specifically cited by Qwest as the basis of one of the disclosures at issue.  See FAC ¶ 54(b).  In Items 13, 14 and 15, Form S-11 asks for a description of real estate interests, including properties and mortgages.  However, Form S-11 asks for a general description of properties and loan terms, not the names of the occupant of the property as allegedly disclosed in the instant case.  Notably, the CFR sections dealing with disclosures under the Securities Act of 1933 do not detail any sort of shield from litigation regarding filings with the SEC.  See Id.  Nor do they exhaustively address the level of detail with which the filer must proceed in completing their securities disclosures.  See Id.
///

15

1    The CapLease Defendants generally point to 17 C.F.R.

2  § 230.400 et seq., as requiring the disclosure of information in

3  the lease agreements per the Securities Act of 1933, 15 U.S.C.

4  § 77 et seq.  The CapLease Defendants specifically cite only an

5  SEC Legal Bulletin, which notes that "except in unusual

6  circumstances, disclosure required by Regulation S-K or any other

7  applicable disclosure requirement is not an appropriate subject

8  for confidential treatment."  SEC Legal Staff Legal Bulletin

9  No. 1 (with Addendum).  The CapLease Defendants thus fail to

10 highlight relevant disclosure requirements reaching the

11 specificity of the alleged disclosure.  The CapLease Defendants

12 also fail to provide case law showing any general privilege or

13 immunity from liability that extends to SEC filings.[7]  Without

14 more, this Court cannot hold that the alleged disclosure meets

15 the exception to the confidentiality agreement and allow the

16 CapLease Defendants to avoid liability.  Accordingly, the

17 CapLease Defendants' Motion to Dismiss Count XIV is DENIED.

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24

25    [7] The three cases cited by the CapLease Defendants in their
Motion to support their "legally required" argument do not deal
26 with either confidentiality agreements or SEC disclosures, and
thus are not on point here.  See, e.g., Mason v. Western Union
27 Telegraph Co., 52 Cal. App. 3d 429, 439 (2d Dist. 1975); Stockton
Morris Plan Co. v. California Tractor & Equipment Corp., 112
28 Cal. App. 2d 684, 689 (3d Dist. 1952); Szold v. Medical Bd. of
California, 127 Cal. App. 4th 591, 599 (4th Dist. 2005).

1        **3.    Aiding and Abetting (Count XVI)**

2

3        "Liability may ... be imposed on one who aids and abets the

4   commission of an intentional tort if the person (a) knows the

5   other's conduct constitutes a breach of duty and gives

6   substantial assistance or encouragement to the other to so act or

7   (b) gives substantial assistance to the other in accomplishing a

8   tortious result and the person's own conduct, separately

9   considered, constitutes a breach of duty to the third person.

10  Mere knowledge that a tort is being committed and the failure to

11  prevent it does not constitute aiding and abetting.  As a general

12  rule, one owes no duty to control the conduct of another...."

13  Fiol v. Doellstedt, 50 Cal. App. 4th 1318, 1325-26 (2d Dist.

14  1996) (internal citations and quotations omitted).

15       Under California law, "liability for aiding and abetting

16  depends on proof the defendant had actual knowledge of the

17  specific primary wrong the defendant substantially assisted."

18  Casey v. U.S. Bank National Ass'n, 127 Cal. App. 4th 1138,

19  1145-46, 26 Cal.Rptr.3d 401, 406 (4th Dist. 2005) (emphasis

20  added).  Liability is found when the defendant "knew that a tort

21  had been, or was to be, committed, and acted with the intent of

22  facilitating the commission of that tort."  Id. at 1146 (citing

23  Gerard v. Ross, 204 Cal. App. 3d 968, 983 (1988)).

24  ///

25  ///

26  ///

27  ///

28  ///

1    Qwest asserts its aiding and abetting claim against the
2    CapLease Defendants on the first prong of common law test,
3    alleging that the CapLease Defendants knew the other Defendants'
4    actions constituted a breach of duty and the CapLease Defendants
5    gave "substantial assistance or encouragement to the other
6    [Defendants] to so act." Fiol, 50 Cal. App. 4th at 1325.  First,
7    Qwest asserts its FAC adequately alleges the CapLease Defendants'
8    knowledge of the other Defendants' duties to Qwest and of the
9    other Defendants' wrongful conduct.  See FAC at ¶¶ 175-180
10   (alleging the CapLease Defendants' knowledge of the Lease, RESA,
11   and Sublease, as well as their knowledge of each Defendant's
12   wrongful conduct as alleged throughout the FAC).  Specifically,
13   Qwest alleges that the CapLease Defendants "advised the other
14   Defendants - regarding all aspects of the DataCenter - their
15   conduct of business with customers and potential customers, and
16   their actions vis a vis Qwest, and the rights and obligations of
17   the Lease, RESA, and Sublease." Id. at ¶ 177.  Further, Qwest
18   states that the CapLease Defendants are "thus directly aware of
19   and encouraged ... [the other Defendants] to respectively take
20   the actions (and omissions) that Qwest alleges above are
21   breaches...." Id. (emphasis added).
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

Combined with Qwest's earlier allegations as incorporated into this Count, Qwest sufficiently alleges the CapLease Defendants' actual knowledge of both the duties owed to Qwest by the other Defendants and the other Defendants' wrongful conduct.[8]

Second, Qwest asserts its allegations concerning the CapLease Defendants' "substantial assistance or encouragement" of the other Defendants are equally sufficient.  <u>Fiol</u>, 50 Cal. App. 4th at 1325.  Qwest points to paragraphs 177 (alleging the CapLease Defendants' advisement) and 188 (referencing the Memo) for support.  The CapLease Defendants discount the alleged advisement, stating that this conduct is "legitimate and commonplace," and that their actions are "merely incident to the CapLease Defendants' role as a diversified real estate investment trust providing financing with respect to the DataCenter." (Def's Rply. in Sup. of Mot. to Dis. 8:10-12.)

However, in <u>In re First Alliance Mortgage Co.</u>, the Ninth Circuit held that substantial assistance and encouragement is found even in "'ordinary business transactions' a bank performs for a customer ... if the bank actually knew those transactions were assisting the customer in committing a specific tort."  471 F.3d 977, 994-95 (9th Cir. 2006) (citing <u>Casey</u>, 127 Cal. App. 4th at 1145).

---

[8] The CapLease Defendants assert that Qwest's allegations reach only constructive knowledge, and not actual knowledge, and thus are insufficient to state a claim.  This assertion is unfounded.  Qwest alleges direct awareness of the other Defendants' duties owed to Qwest as shown through the CapLease Defendants' advisement to the other Defendants of the rights and obligations required under the contracts at issue.  Notably, the CapLease Defendants challenge Qwest's allegation of advisement only with respect to Qwest's substantial assistance and encouragement allegation.

19

1  As noted above, Qwest sufficiently alleged the CapLease
2  Defendants' knowledge of the other Defendants' tortious conduct.
3  Moreover, Qwest's allegations that the CapLease Defendants
4  encouraged the other Defendants in their wrongful conduct,
5  through advisement via their financial role (FAC at ¶ 177) and
6  through recommendations of bonuses to reward and encourage the
7  same tortious conduct (FAC at ¶ 188) is sufficient to allege
8  aiding and abetting under California law.  Qwest sufficiently
9  alleged that the CapLease Defendants "knew that a tort had been,
10 or was to be, committed, and acted with the intent of
11 facilitating the commission of that tort." Casey, 127 Cal. App.
12 4th at 1146 (citing Gerard v. Ross, 204 Cal. App. 3d at 983).
13 Accordingly, the CapLease Defendants' Motion to Dismiss Count XVI
14 is DENIED.

15

16                            **CONCLUSION**

17

18      The CapLease Defendants' Motion to Dismiss all counts of
19 Qwest's FAC as to the CapLease Defendants (Counts I, VIII, X,
20 XII, XIV, and XVI) under Rule 12(b)(6) is DENIED.
21      IT IS SO ORDERED.
22
   Dated: August 18, 2008
23
24
25                            _____
                              MORRISON C. ENGLAND, JR.
26                            UNITED STATES DISTRICT JUDGE
27
28